IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MELISSA JONES,
a West Virginia Resident,

         Plaintiff,

v.            CIVIL ACTION NO. 3:19-0373

MARTIN TRANSPORT, INC.,
a Texas Corporation;
MARTIN RESOURCE MANAGEMENT CORPORATION,
a Texas Corporation; and
LARRY WILLIAMS,
a West Virginia Resident,

         Defendants.

## MEMORANDUM OPINION AND ORDER

Presently pending before the Court is a Motion for Summary Judgment filed by Defendants Martin Transport, Inc. and Martin Resource Management Corporation, Inc. *Mot. for Summ. J.*, ECF No. 26. Plaintiff Melissa Jones timely filed a Response in Opposition, and Defendants did the same with their Reply. *Resp. in Opp'n*, ECF No. 28; *Reply*, ECF No. 29. The issues have been fully briefed and Defendants' Motion is ripe for resolution. For the reason set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

### I. BACKGROUND

This action arises out of an alleged pattern of workplace sexual harassment directed against Plaintiff after beginning her employment with Defendants on September 4, 2018. *Compl.*, ECF No. 1-1, at ¶ 13; *see also Ex. A*, ECF No. 27-1, at 74–77. Daryl Moore—the terminal manager for Defendants' Kenova, West Virginia location—asked Plaintiff to come to the terminal to complete

an employment application. *Ex. A*, at 75. Moore "friended [Plaintiff] on Facebook that same day and was messaging [her] on Facebook that same night." *Id.* at 77. He almost immediately began sending suggestive Facebook messages, including "I hate going out of town and staying in hotels by myself all the time sux" and "Don't say that I'll have you doin [sic] my laundry cleaning my office in a bunny suit and filing paperwork."[1] *Ex. B*, ECF No. 27-2, at 2–4. Plaintiff wrote these messages off, noting that "[t]he guys have always given me a lot of shit and I give it right back and we laugh and call it a day." *Id.* at 13. Moore continued sending increasingly sexual messages, telling Plaintiff "[y]ou need to go get laid my dear" and "Wo[w] your [sic] just as much of a freak as me." *Id.* at 16.

On September 17, 2018, Plaintiff reported for orientation in Kilgore, Texas. *Ex. A*, at 131. On the second day of programming, Plaintiff went to lunch with several instructors employed by Defendants. *Id.* at 134. At some point during the meal, Plaintiff stepped outside to smoke a cigarette and was approached by Tim Sisco, a fellow trainee. *Id.* Asked why she had not been sitting at his table, Plaintiff responded that she "was sitting at the table next to him with the instructors." *Id.* Sisco responded "[o]h, you were over there blowing the instructors, hahaha." *Id.* "[V]ery, very, very upset at this point," Plaintiff approached an instructor and told him that she wanted to quit and return home. *Id.* at 137–38. She mentioned Sisco's comment, and the instructor immediately took her to human resources ("HR") in the same building. *Id.* at 140.

Plaintiff spoke with two HR representatives upon arrival. *Id.* at 141. She mentioned her conversation with Sisco and the messages she had received from Moore. *Id.* The representatives were "shocked and surprised," and assured here that "[s]tuff like that didn't happen at Martin." *Id.*

---

[1] Other messages contained similar innuendos. *See*, *e.g.*, *Ex. B*, at 12 ("i don't think you can handle it[.] aww aint you sweet and willing[.] that sounded bad[. . .] i can prob be a bit forward and crude.").

The next day, Martin's Vice President for Operations dispatched a representative to Kenova to fire Moore. *Ex. D*, ECF No. 27-4, at 1–2. Sisco, on the other hand, "denied the allegations made against him" and was simply "removed from orienting with [Plaintiff] following her report." *Id.* at 2.

Following orientation, Plaintiff returned to Kenova and began work. *Ex. A*, at 157. Her supervisor was Defendant Larry Williams, who assigned her to various training assignments with a driver named Gilmer Gue. *Id.* at 157–58. On the second assignment, Plaintiff alleges that Gue began making crude sexual remarks. *Id.* at 161–62. In particular, she claims that "[h]e just started talking about . . . his size, how his wife wouldn't give him none, how a wife should."[2] *Id.* at 162. She recalls this behavior lasting "for days," despite her asking him to "knock it off." *Id.* at 163.

On October 12, 2018—and after completing several trips with Gue—Williams assigned Plaintiff to a trip to Tennessee. *Id.* at 176. Plaintiff requested to complete the trip in a separate truck rather than with another driver, but Williams refused. *Id.* at 178. Plaintiff next asked to be paired with a female driver, which Williams also refused. *Id.* at 179. Confronted with the possibility of further training with male drivers, Plaintiff disclosed Gue's comments to Williams. *Id.* He reacted with disbelief and anger, explaining that Gue "has been with us ten years. He wouldn't do that." *Id.* at 189. For her part, Plaintiff remained consistent in her refusal to "get in a truck with another male Martin employee." *Id.* at 190. She asked whether her refusal meant she was being fired; Williams responded "[t]hat is up to you." *Id.* at 192.

Plaintiff contacted HR the same day and asked whether it would be possible to continue her training with female drivers; the representative she spoke with said she "would look into the allegations and do some research." *Id.* at 193. While Plaintiff attempted to contact Williams by

---

[2] Gue's inappropriate remarks encompassed significantly more than a single comment. *See Ex. A*, at 162–172.

phone on October 15, 2018, he did not answer and she did not leave a message. *Id.* at 203. Nobody at the company—either Williams or HR—contacted her in the days after October 12, 2018. *Id.* at 203–04. Instead, Plaintiff was terminated on October 17, 2018 for failing to make daily "check calls" as required by her job description. *See Ex. F*, ECF No. 27-6, at 8. Defendants contend that Plaintiff's failure to contact Williams between October 13, 2020 and October 17, 2020 justified her firing, *Mem. in Support of Mot. for Summ. J.*, ECF. No. 27, at 5, which Plaintiff only learned of by logging onto the payroll system and observing that her employment status read as "terminated," *Ex. A*, at 200.

Plaintiff initiated the instant lawsuit in the Circuit Court of Wayne County, West Virginia on April 11, 2019. *See Compl.*, at 1. She split her complaint into six purported counts: a claim for violation of the West Virginia Human Rights Act (Count One), a claim for negligent supervision and retention (Count Two), a claim for wrongful termination in violation of public policy (Count Three), a claim for intentional infliction of emotional distress (Count Four), a claim for negligent infliction of emotional distress (Count Five), and a "claim" for vicarious liability (Count Six). *Id.* at ¶¶ 35–68. Invoking this Court's diversity of citizenship jurisdiction, Defendants filed a Notice of Removal on May 10, 2019. *Notice of Removal*, ECF No. 1, at 3. Discovery proceeded apace, and Defendants filed the instant Motion for Summary Judgment on February 24, 2020. *See Mot. for Summ. J.*, at 1. Before turning to that Motion, the Court will undertake a brief review of the law that will govern its analysis.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Facts are 'material' when they might affect

the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). "The moving party is 'entitled to judgment as a matter of law' when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial." *Id.* (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999)).

At summary judgment, the Court's role is not to act as a jury and "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will view the nonmovant's evidence in the most favorable light and draw "all justifiable inferences" in that party's favor. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Of course, such inferences "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture," *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001), and a nonmoving party "may not rely merely on allegations or denials in its own pleading" but must instead "set out specific facts showing a genuine issue for trial," *The News & Observer Publ'g Co.*, 597 F.3d at 576 (quoting Fed. R. Civ. P. 56(e)). "Mere speculation by the non-movant cannot create a genuine issue of material fact" sufficient for a nonmoving party to overcome its burden. *JKC Holding Co.*, 264 F.3d at 465. Put succinctly: a "scintilla of evidence," without any other support, is not enough to survive a motion for summary judgment. *Anderson*, 447 U.S. at 252.

### III. DISCUSSION

Defendants have moved for summary judgment on all five counts[3] contained in Plaintiff's Complaint. For the sake of analytical clarity, the Court will address each claim separately. After

---

[3] As noted *supra*, the Complaint is technically split into six purported counts. The sixth of

considering each claim, the Court will turn to Defendants' argument regarding the availability of punitive damages.

**A. Violations of the West Virginia Human Rights Act**

Plaintiff's first cause of action centers on the West Virginia Human Rights Act ("WVHRA"), W. Va. Code §§ 5-11-1 *et seq.* Specifically, she claims that the "unwelcome and wrongful conduct of Defendants . . . created a hostile work environment for Melissa Jones which was substantially motivated by her gender." *Compl.*, at ¶ 36. She also claims that the "Martin Defendants wrongfully retaliated against" her for reporting the hostile work environment and harassment. *Id.* at ¶ 37. Defendants contend that no genuine issue of material fact remains, and specifically that Plaintiff cannot establish that they are vicariously liable for any harassment. *Mem. in Support of Mot. for Summ. J.*, at 7.

> To make out a claim for sexual harassment against an employer under the WVHRA based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

*Hanlon v. Chambers*, 464 S.E.2d 741, 745, Syl. Pt. 5 (W. Va. 1995). "Where an employee has been harassed by a coworker, 'the employer may be liable in negligence [under the fourth element] if it knew or should have known about the harassment and failed to take effective action to stop

---

these, however, is not really a standalone claim; instead, it is styled "*Respondeat Superior* and Liability of Defendants." *See Compl.*, at 14. Of course, these are legal doctrines rather than actual causes of action. To the extent the Count Six seeks to clarify that *respondeat superior* is a legal doctrine recognized in West Virginia, the Court agrees. *See Dunn v. Rockwell*, 689 S.E.2d 255, 259, Syl. Pt. 12 (W. Va. 2009) ("The doctrine of *respondeat superior* imposes liability on an employer for the tortious acts of its employees, not because the employer is at fault, but merely as a matter of public policy."). To the extent Count Six is characterized as an actual claim for relief rather than a doctrine for assigning liability, Defendants are entitled to summary judgment.

it.'"[4] *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (quoting *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc)) (brackets in original). Pertinent to this case, "[o]nce the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (internal quotations omitted).

At the outset, the Court acknowledges that Defendants have established an anti-harassment policy that governs its employees. *See Ex. C*, ECF No. 27-3. As they note, "[t]he institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187 (4th Cir. 2001) (internal quotations omitted). Yet "[w]hile the 'adoption of an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care,' the policy must be effective in order to have meaningful value." *Sunbelt Rentals, Inc.*, 521 F.3d at 320 (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000). With the record before the Court, it is far from clear that Defendants' anti-harassment policy was actually effective in achieving its goals.

Plaintiff's harassment claims essentially arise out of three sets of facts: Moore's Facebook messages, Sisco's lunchtime comment, and Gue's repeated remarks while driving. As Defendants note at length, Moore was immediately fired after Plaintiff informed them of his behavior. Sisco, while not fired, was "removed from orientation and did not continue his orientation with Plaintiff thereafter." *Mem. in Support of Mot. for Summ. J.*, at 8. He also received sexual harassment

---

[4] Federal precedent is applicable here as the Supreme Court of Appeals of West Virginia has "consistently held that cases brought under the West Virginia Human Rights Act . . . are governed by the same analytical framework and structures [as those] developed under Title VII." *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 159 (W. Va. 1995).

training. *Id*. at 9. If Plaintiff's claims were limited to just these allegations, summary judgment in Defendants' favor would likely be warranted.[5] Yet Plaintiff's claims are not, in fact, so limited. She recounts disclosing Gue's harassing behavior to her supervisor on October 12, 2018, as well as his response of anger and disbelief. *Ex. A*, at 187. She repeated these same allegations directly to a representative in HR that very day, who informed her that she "would look into the allegations and do some research and stuff like that and that she would get back to" Plaintiff. *Id.* at 193. Of course, HR did not respond to Plaintiff over the next several days. In fact, it is unclear what their investigation of Gue involved beyond interviewing him and concluding that they could not substantiate Plaintiff's claims. *Ex. D*, ECF No. 27-4, at ¶ 6. It is likewise unclear if the Defendants responded in any other way to Plaintiff's allegations.

Taken in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants had failed to respond in a way "reasonably calculated to end the harassment." *Xerxes Corp.*, 639 F.3d at 669. Indeed, while Defendants argue that they "promptly and decisively ended each episode of harassment reported to them," there is no evidence whatsoever that they took *any* remedial action with respect to Gue's comments beyond interviewing him. *Mem. in Support of Mot. for Summ. J.*, at 9. Quite the contrary: with the evidence presently before the Court, it appears that their only response was to terminate Plaintiff herself five days after learning of her allegations. Summary judgment is therefore inappropriate with respect to Plaintiff's claims of unlawful harassment.

---

[5] It is worth pointing out that these allegations are sufficient to meet the first three elements of the WVHRA harassment test outlined in *Hanlon*, 464 S.E.2d at 745, Syl. Pt. 5. The same is true for Gue's comments, though—as explained further—his are the only ones that are imputable on some basis to Defendants. *See id.*

**B. Negligent Supervision and Retention**

Plaintiff's second cause of action is one for negligent supervision and retention with reference to Williams, Moore, Sisco, and Gue. In particular, she contends that Defendants breached their duty to ensure that their employees did not violate the WVHRA. *See Compl.*, at ¶¶ 43–44. Defendants, on the other hand, argue that her claims fail as a matter of law. In West Virginia,

> [t]he test for determining whether an employer negligently hired and retained an employee is as follows: '[w]hen the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?'"[6]

*Woods v. Town of Danville,* 712 F. Supp. 2d 502, 514 (S.D.W. Va. 2010) (quoting *McCormick v. W. Va. Dep't of Public Safety*, 503 S.E.2d 502, 506 (W. Va. 1998) (per curiam)). "As with negligence torts more generally, the analysis centers on whether the employer was on notice of the employee's propensity (creating a duty), yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct." *Radford v. Hammons*, No. 2:14-24854, 2015 WL 738062, at *7 (S.D.W. Va. Feb. 20, 2015). Here, the Court's analysis of Plaintiff's claims follows a similar pattern as above.

As noted, Plaintiff predicates her negligent supervision and retention claim on the allegedly tortious conduct of Williams, Moore, Sisco, and Gue. With respect to Williams, Plaintiff has not presented any evidence that he actually committed a tort that could form the basis of a negligent

---

[6] This analytical framework is quite similar to that employed with respect to negligent supervision claims. *See Woods v. Town of Danville,* 712 F. Supp. 2d 502, 514–15 (S.D.W. Va. 2010) ("Under West Virginia law, negligent supervision claims must rest upon a showing that [an employer] failed to properly supervise [an employee] and, as a result, [that employee] proximately caused injury to the plaintiffs.").

supervision or retention claim. With respect to Moore, Plaintiff has not produced any evidence suggesting that Defendants knew or should have known of his propensity for sexual harassment. To the contrary, the evidence shows that Defendants fired Moore the day after becoming aware of his behavior. Nor has Plaintiff presented any evidence that Defendants knew or should have known of a risk that Sisco would unlawfully harass her. No number of logical somersaults combine to demonstrate that Defendants acted unreasonably in failing to take action with these three employees, because they did not know (and had no reason to know of) any tortious conduct before Plaintiff reported it and they responded to it.

The same cannot be said of Defendants' response to Plaintiff's allegations against Gue. Of course, it is true that Plaintiff has not presented evidence that they knew or should have known of Gue's alleged propensity for unlawful harassment before any harassment occurred. Yet this changed when Plaintiff informed Williams and HR of Gue's comments. As noted earlier, there is no evidence that Defendants took any concrete action in response to these allegations beyond interviewing Gue and accepting his denial. A reasonable juror, viewing the evidence in the light most favorable to Plaintiff, could conclude that Defendants unreasonably failed to take action—manifesting a breach—in response to Plaintiff's allegations. A reasonable juror could similarly conclude that this failure resulted in harm to Plaintiff, who was terminated as she waited for a response from HR. It follows that summary judgment is not warranted with respect to Plaintiff's second cause of action.

### C. Wrongful Termination in Violation of Public Policy

Plaintiff's third cause of action is one for wrongful termination in violation of public policy. *See Compl.*, at ¶¶ 45–51. In particular, she claims that she was fired in retaliation for reporting sexual harassment. *Id.* at ¶ 47. Defendants respond that Plaintiff was not fired for reporting sexual

harassment, but rather for violating the call-in rule outlined in her job description. *Mem. in Support of Mot. for Summ. J.*, at 12.

In West Virginia, "the rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." *Harless v. First Nat'l Bank*, 246 S.E.2d 270, 275 (W. Va. 1978). "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, [courts] look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." *Birthisel v. Tri-Cities Health Servs. Corp.*, 424 S.E.2d 606, 607, Syl. Pt. 2 (W. Va. 1992). While "no general public policy against harassment in the workplace is created by the West Virginia Human Rights Act for purposes of West Virginia wrongful discharge law," such a public policy does exist where an individual "was discriminated against because of race, religion, color, national origin, ancestry, sex, age, blindness, or handicap." *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 433 (W. Va. 1998).

Of course, this discussion is largely academic given Defendants' concession they are subject to the terms of the WVHRA's bar on retaliation for protected conduct. *See Mem. in Support of Mot. for Summ. J.*, at 11 n.4. It follows that the Court interprets Plaintiff's claim as essentially one for retaliation for complaining of unlawful harassment. *See* W. Va. Code § 5-11-9(7)(C). To make out a *prima facie* case for retaliation, a plaintiff bears the burden of demonstrating

> (1) that [she] engaged in protected activity, (2) that [her] employer was aware of the protected activities, (3) that [she] was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that [her] discharge followed . . . her protected activities within such period of time that the court can infer retaliatory motivation.

*Frank's Shoe Store v. W. Va. Human Rights Comm'n*, 365 S.E.2d 251, 252, Syl. Pt. 4 (W. Va. 1986). Once a plaintiff "has adduced evidence sufficient to establish a prima facie case, the employer must then come forward with reasons justifying a finding that unlawful discrimination was not the cause of the employment action." *Hanlon*, 464 S.E.2d at 747 n.3. "The plaintiff must [then] have an opportunity to show that the proffered explanation was pretextual or that a retaliatory motive at least contributed to the discharge decision." *Id.* at 755.

Here, Plaintiff has little difficulty establishing a *prima facie* case of unlawful discrimination. Reporting sexual harassment is a protected activity under the WVHRA. *See id.* at 754–55. Defendants were aware of each incident of harassment. *See Ex. A*, at 141, 179. Plaintiff was, in fact, discharged, and that discharge occurred within five days of reporting Gue's sexual harassment. *Id.* at 200. And contrary to Defendants' argument, a five-day gap[7] certainly supports an inference of retaliatory motivation.[8] Having stated a *prima facie* case, the burden shifts to Defendants to demonstrate a legitimate reason for Plaintiff's termination. *Hanlon*, 464 S.E.2d at 747 n.3. They point to her violation of the daily call-in rule, and claim she was fired for this reason. *Mem. in Support of Mot. for Summ. J.*, at 12. Yet to meet her burden, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment

---

[7] While neither party raises the point, the Court notes that Plaintiff's disclosure of Gue's harassment occurred on *Friday*, October 12, 2018, and she was fired on Wednesday of the following week. If follows that the five-day gap between her disclosure and termination did not even encompass a full work week. The Court also finds relevance in Plaintiff's recollection that she called Williams on October 15, 2018, but that he did not answer and she did not leave a message. *See Ex. A*, at 203.

[8] While "there is no bright-line rule for temporal proximity," *King v. Pulaski Cnty. Sch. Bd.*, 195 F. Supp. 3d 873 (W.D. Va. 2016), the Supreme Court of Appeals of West Virginia considered the temporal connection between an employee's termination "within a week after her last complaint" of harassment to be "obvious," *Hanlon*, 464 S.E.2d at 755. This Court agrees with Justice Cleckley's sound characterization of the appropriate inferences to be drawn from the passage of time.

decision." *Hanlon*, 464 S.E.2d at 747 n.3. Rather, Plaintiff need only demonstrate that "the prohibited factor was at least one of the motivating factors" in her firing. *Id.* Here, the obvious temporal proximity of her termination—combined with Williams' angered reaction to her disclosure and HR's failure to respond to her allegations against Gue—give rise to the reasonable inference that Plaintiff's termination was at least partially the product of retaliation.[9] Simply put, "the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder at trial." *Id.* at 748. Summary judgment is therefore inappropriate, and Defendants' Motion must be denied with respect to Plaintiff's third cause of action.

### D. Intentional Infliction of Emotional Distress

Plaintiff's fourth cause of action is grounded in a theory of intentional infliction of emotional distress ("IIED"). She argues that Defendants engaged "in a pattern of sexual harassment and/or retaliation and/or by facilitating and encouraging the same," and that she suffered severe emotional anguish as a result. *Compl.*, at ¶ 53. Defendants argue that she has not pointed to any conduct that is sufficiently outrageous to give rise to a claim for IIED, and in any event that she did not actually suffer severe emotional distress. *Mem. in Support of Mot. for Summ. J.*, at 14.

> To succeed on a claim for IIED in West Virginia, a plaintiff must demonstrate
>
> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the

---

[9] The Court is mindful that "in assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, [it] must be alert to the fact employers are rarely so cooperative as to include a notation in the personnel file that their actions were motivated by factors expressly forbidden by law." *Hanlon*, 464 S.E.2d at 748 n.4 (internal quotations and punctuation omitted).

actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis*, 504 S.E.2d at 421, Syl. Pt. 3. With respect to the first of these factors, "whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Id.* at 421, Syl. Pt. 4. Although "there is no bright line separating conduct that may reasonably considered outrageous from conduct that may not, *see Lambert v. Hall*, No. 5:17-cv-01189, 2017 WL 2873050, at *4 (S.D.W. Va. July 5, 2017), "conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct." *Courtney v. Courtney*, 413 S.E.2d 418, 423–24 (W. Va. 1991).

In the instant case, the Court cannot conclude that Plaintiff's allegations of harassment meet this high bar. It is true that in some cases of severe, pervasive sexual harassment and abuse, courts in this district have concluded that conduct could be considered "plainly outrageous." *See, e.g.*, *Hager v. Robinson*, No. 2:03-0094, 2005 WL 8159176, at *15 (S.D.W. Va. Feb. 1, 2005) (pattern of abuse against inmate involving two instances of sexual penetration and additional instances of fondling and exposure by prison guard); *see also Gilco v. Logan Cnty. Comm'n*, No. 2:11-0032, 2012 WL 2580056, at *5 (S.D.W. Va. Aug. 17, 2012) (pattern of abuse involving home confinement officer coercing detainee into performing sexual acts).

Yet these cases—involving allegations of actual sexual abuse—rise well above the conduct detailed in the record. With respect to Williams, his only arguably distressing conduct was reacting with anger to Plaintiff's disclosure of Gue's harassment. This "uncivil" conduct is insufficient to be considered "outrageous" in the context of an IIED claim. *See Courtney*, 413 S.E.2d at 423. The

same is true with respect to Plaintiff's claims of harassment by Moore, Sisco, and Gue.[10] To be absolutely clear, their comments run the gamut from graceless to vulgar and reflect highly inappropriate workplace behavior. Moore repeatedly insinuated his desire to have sexual conversations and relations with Plaintiff, Sisco interpreted Plaintiff's presence at her supervisors' lunch table as the product of her granting sexual favors, and Gue regaled Plaintiff with sexual commentary over the course of several training rides. Yet the question before the Court is not the propriety of these statements, but whether they "must be regarded as atrocious, and utterly intolerable in a civilized community." *Bourne v. Mapother & Mapother, P.S.C.*, 998 F. Supp. 2d 495, 507 (S.D.W. Va. 2014) (quoting *Tanner v. Rite Aid of W. Va., Inc.*, 461 S.E.2d 149, 157 (W. Va. 1995)). Indeed, "[i]t is not enough that an actor act with tortious or even criminal intent" to meet this threshold. *Id.* "The extreme and outrageous requirement is a notoriously high burden to meet," *id.*, and the loutish statements at issue here are insufficient to do so. Defendants' Motion is therefore granted with respect to Plaintiff's IIED claim.

### E. Negligent Infliction of Emotional Distress

Plaintiff's fifth cause of action is grounded in a theory of negligent infliction of emotional distress ("NIED"). *See Compl.*, at ¶¶ 56–64. Defendant argues that summary judgment is appropriate, as Plaintiff has not pleaded facts or solicited evidence that could support an NIED claim. *Mem. in Support of Mot. for Summ. J.*, at 15.

---

[10] For the purposes of this discussion, the Court cabins consideration of whether Moore, Sisco, and Gue's statements were made in the scope of their employment. *See Travis*, 504 S.E.2d at 421, Syl. Pt. 6 ("Where a supervisor of an employer has, *within the scope of employment*, caused, contributed to, or acquiesced in the intentional or reckless infliction of emotional distress upon an employee, then such conduct is attributed to the employer, and the employer is liable for the damages that result." (emphasis added)).

The Court's analysis of Defendants' argument is straightforward. Under West Virginia law, a "defendant may be held liable for negligently causing a plaintiff to experience serious emotional distress, after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct, even though such distress did not result in physical injury." *Heldreth v. Marrs*, 425 S.E.2d 481, 482, Syl. Pt. 1 (W. Va. 1992). Though these doctrinal strictures have since been somewhat loosened, *see*, *e.g.*, *Ricotilli v. Summersville Hosp.*, 425 S.E.2d 629, 630, Syl. Pt. 2 (W. Va. 1992) (creating exception, "often referred to as the 'dead body exception,' permitt[ing] recovery for emotional damages upon proof of the negligent mishandling of a corpse"), a plaintiff cannot succeed on an NIED theory where the challenged actions are directed solely at herself, *Ali v. Raleigh Cnty.*, No. 5:17-cv-03386, 2018 WL 1582721, at *12 (S.D.W. Va. Mar. 29, 2018). Here, Plaintiff points only to her own alleged injuries as the factual basis for her NIED claim. Her claim is deficient as a matter of law, and summary judgment in Defendants' favor is therefore warranted.

### F. Punitive Damages

Defendants' final argument is that Plaintiff is not entitled to punitive damages in this case, and that Plaintiff's claims for punitive damages should be dismissed. *Mem. in Support of Mot. for Summ. J.*, at 16. Plaintiff includes claims for punitive damages as part of her first, *Compl.*, at ¶ 39, third, *id.* at ¶ 50, and fifth, *id.* at ¶ 62, causes of action. Defendant argues that Plaintiff's claims for emotional distress damages and punitive damages are duplicative, and that in any event she has not demonstrated the actual malice necessary to sustain claims for punitive damages. *Mem. in Support of Mot. for Summ. J.*, at 16, 18.

With respect to Defendants' first argument, "[i]t is generally recognized that there can be only one recovery of damages for one wrong or injury." *Harless*, 289 S.E.2d at 694, Syl. Pt. 7. For

this reason, damages for both emotional distress and punitive damages are impermissible absent an employer's conduct that is "wanton, willful or malicious." *Id.* at 694, Syl. Pt. 5. Of course, the Supreme Court of Appeals of West Virginia has been "careful to point out that the concept applie[s] only where" an award is based "on the torts of intentional or reckless infliction of emotional distress." *Nance v. Ky. Nat'l Ins. Co.*, No. 2:02-0266, 2006 WL 8438703, at *5 (S.D.W. Va. Mar. 28, 2006). As the Court has already granted summary judgment to Defendants on Plaintiff's claims for IIED and NIED, it need dwell no further on this argument.

Defendants' next contention is that Plaintiff cannot establish that they acted with the "actual malice" necessary to justify an award of punitive damages. *Mem. in Support of Mot. for Summ. J.*, at 18. In West Virginia, a Plaintiff may recover punitive damages where she demonstrates by clear and convincing evidence that "the defendant [acted] with actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others."[11] W. Va. Code § 55-7-29(a). This reflects the fact that "the level of bad conduct on the part of the defendant must be very high in order to meet the punitive standard." *Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815, 910 (W. Va. 2010) (Workman, J., concurring in part).

In this case, Plaintiff has included several references to "malicious" conduct in her Complaint. *See*, *e.g.*, *Compl.*, at ¶ 39. Yet the Court is not bound by Plaintiff's own characterization of her allegations, and must instead rely on the evidence presently before it. At most, Plaintiff has laid out a set of facts suggesting that Defendants acted negligently and unlawfully in failing to

---

[11] This standard replaced the formerly governing standard from the Supreme Court of Appeals of West Virginia as of June 8, 2015. *See Kuykendall v. Miller Transporting, Inc.*, No. 1:19-cv-137, 2020 WL 1430469, at *2 (N.D.W. Va. Mar. 23, 2020); *Moore v. Ferguson*, No. 2:15-cv-04531, 2015 WL 3999596, at *3 n.3 (S.D.W. Va. Jul. 1, 2015).

investigate her accusations about Gue and in terminating her employment without doing so. What she has not done is present evidence that this lacking conduct was influenced by "actual malice" or carried out with "a conscious, reckless and outrageous indifference to the health, safety, and welfare of others." *See* W. Va. Code § 55-7-29(a). The fact that Plaintiff must make her showing by "clear and convincing" evidence—the "highest possible standard of civil proof"—only makes this point clearer. *See* W. Va. Code § 55-7-29(a); *Brown v. Gobble*, 474 S.E.2d 489, 494 (W. Va. 1996). As such, Defendants are entitled to summary judgment with respect to the availability of punitive damages.

## IV. CONCLUSION

Consistent with the foregoing analysis, the Court **GRANTS IN PART** the Motion, ECF No. 26, with respect to punitive damages and Counts Four, Five, and Six of the Complaint, but **DENIES IN PART** the Motion with respect to Counts One, Two, and Three.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

       ENTER:    April 8, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE